UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RICKY N. EAVES, | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No.1:12-cv-10336 |
| v. | ) | |
| | ) | |
| THE CITY OF WORCESTER, a municipal | ) | |
| Corporation, WORCESTER CITY | ) | |
| MANAGER MICHAEL V. O'BRIEN, | ) | |
| WORCESTER CHIEF OF POLICE GARY | ) | |
| J. GEMME, JESUS CANDELARIA, and | ) | |
| THOMAS C. DUFFY, | ) | |
| Defendants | ) | |

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

1.    This is a civil rights action against two officers and the chief of the Worcester Police Department, the City of Worcester, and its chief executive officer on claims of false arrest and malicious prosecution by the officers, with supervisory liability and municipal liability claims against the City and the two officials. By their acts and omissions the defendants proximately caused the plaintiff to be jailed unlawfully for 73 days.

### JURISDICTION

3.    This action is brought pursuant to 42 U.S.C. § 1983, alleging violations of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, claims subject to the jurisdiction of this Honorable Court per Title 28 U.S.C. § 1331 and 1343; and alleging common law torts encompassed by the supplemental jurisdiction of the Court per 28 U.S.C. § 1367.

### PARTIES

4.    Plaintiff Ricky N. Eaves ("Eaves") resides in the City of Worcester, Worcester County, Massachusetts.

5.    Defendant City of Worcester ("the City") is a municipal corporation duly organized and chartered under the laws of the Commonwealth of Massachusetts, with its place of business at 455 Main Street, City of Worcester, Worcester County, Massachusetts.

6.    Defendant Michael V. O'Brien ("O'Brien") was at all times material hereto the chief executive officer of the City with the job title of City Manager.

7.      Defendant Gary J. Gemme ("Gemme") was at all times pertinent hereto a duly sworn police officer and the Worcester Chief of Police.

8.      Defendant Jesus Candelaria ("Candelaria") was at all pertinent times a duly sworn officer of the Worcester Police Department ("WPD").

9.      Defendant Thomas Duffy ("Duffy") was at all pertinent times a duly sworn officer of the WPD.

10.     Each individual defendant is sued in his individual and official capacities.

## FACTS

11.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

12.     At all relevant times the City was the employer of each individual defendant.

13.     At all times pertinent hereto O'Brien, as City Manager, was the keeper of the peace within the City of Worcester, with authority over Gemme and the WPD, including but limited the power to impose discipline and the power to require accountability by officers for use of excessive or unjustified force and for misstatements of fact in official reports.

14.     At all times pertinent hereto Gemme, as Chief of Police, exercised authority over the WPD and its officers and was a maker of policy as to standards of conduct and discipline within the WPD.

15.     At all times pertinent hereto the each individual defendant acted under color of law in his capacity as a police officer or city official and pursuant to the statutes, ordinances, regulations, policies, customs, practices, and usage of the Commonwealth of Massachusetts and/or the City of Worcester.

## False Arrest and Malicious Prosecution of Eaves

16.     On or about the early morning hours of February 25, 2009, Candelaria was on patrol in a police cruiser in the Kelley Square area of Worcester when he received a police radio dispatch regarding a suspicious vehicle on Goldwaithe Road in the city.

17.     When Candelaria arrived at Goldwaithe Road he did not see the vehicle described in the dispatch.

18.     Candelaria, according to the false report he later filed, drove down Plantation Street and at a Shell gas station at 747 Plantation Street saw a vehicle matching the vehicle description in the dispatch (an Astro van) "pulling in the gas station."

19.     Candelaria falsely stated in his report that "I activated my lights as the suspect vehicle came to a stop at one of the gas pumps."

20.     In fact Candelaria was not the officer that spotted or stopped the suspect vehicle at that time and place.

21.     In his report Candelaria wrote a fictionalized account of the stop and the ensuing searches and arrests, knowingly fabricating, altering, and misrepresenting both material and immaterial facts so as to charge Eaves with criminal offenses without cause.

22.     Candelaria, who in fact did not arrive on the scene until after the stop was initiated, falsely reported that he initiated the stop with Duffy, that "I exited my cruiser and officer Duffy exited his" and that he, Candelaria, made observations of the vehicle and its occupants that he never made because he was not there and because the observations he reported were false.

23.     Candelaria's report stated: "We approached the vehicle and I asked the operator for an ID. As he was looking for his ID I noticed a bunch of glassine sandwich baggy knots all over the floor. At this time I noticed the rear passenger a pregnant white female moving around in her seat and the front of her pants unbuttoned" so that she could hide something he claimed she was retrieving from a handbag.

24.     This was false because Candelaria was not present and did not participate in the initial approach, did not ask the driver for ID and did not make any observations of the driver, the floor, or of the rear seat passenger at that time.

25.     Candelaria's report stated that Eaves was behind the wheel of the vehicle, when in fact Eaves was a front seat passenger and not the driver.

26.     Candelaria report stated that next "Officer Duffy, Bishop and myself asked all occupants to step out of the vehicle before she [the rear seat passenger] hid what she was trying to retrieve."

27.     In fact Candelaria was not present when the occupants were removed from the vehicle.

28.     Candelaria's report falsely portrayed him as being the officer who searched Eaves, stating: "I led the operator away from the vehicle and cuffed him for my safety and conducted a pat-frisk. No were weapons (sic) found at this time. He was Rickie N. Eaves, DOB _/_/73."

29.     It was in fact Duffy who ordered Eaves out of the front passenger seat and walked him away from the vehicle.

30.     To help fabricate pretext for searching the vehicle and its occupants, Candelaria reported falsely that on approaching the vehicle he had seen a "white chunk" in a glassine bag protruding from a handbag in the back seat, when in fact was not present at that time and place.

31.     To fabricate the basis for charging Eaves and Page with the narcotic offenses, Candelaria falsely reported finding what appeared to be crack cocaine, a syringe and a pipe at the feet of the driver's seat and a stash of syringes and baggies on the passenger's side.

32.     When Candelaria prepared and signed his false report, he knew that under state law an officer who knowingly "files or publishes any false written report . . ." is guilty of a crime. M.G.L. c. 268, § 6A.

33.     Candelaria also knew from his training that the Worcester Police Department forbade him to file an untruthful report.

34.     Candelaria, and Duffy knew that WPD Policy 1402.1, which governed "Truthfulness" provided: "[A]n officer or employee of the Department shall truthfully state facts in all reports as well as when he appears before or participates in any judicial, Departmental or other official investigation, hearing, trial or proceeding. He shall fully cooperate in all phases of such investigations, hearings, trials and proceedings."

35.     As verified by a security video, Cristina M. Page was the driver of the Astro van that pulled into the gas station and was then stopped by police.

36.     Eaves was the front seat passenger and Kerrie L. Deasey ("Deasey") occupied the rear seat.  http://youtu.be/9s4-ZedvrHg

37.     Minutes later Page put the vehicle into reverse to pull back from another car in front of her, when Duffy pulled his cruiser in behind her, blocking her in, and activated his flood lights.

38.     With Candelaria nowhere in sight, Duffy approached Ms. Page on the driver side of the Van.

39.     Duffy then walked in front of the Astro Van and approached Eaves on the passenger side of the vehicle, ordering him to get out.

40.     Eaves had a cell phone in his hand when Duffy approached him, ordered him out of the vehicle and stated, "put the fucking phone down."

41.     Eaves complied with both instructions.

42.     Eaves then followed Duffy's instruction to sit next to a pair of gas pumps.

43.     Other officers arrived and removed Page and Deasy from the vehicle.

44.     Page was instructed to sit next to Eaves.

45.     Ms. Deasy was brought to the front of the vehicle and frisked.

46.    Some 35 seconds after Duffy removed Eaves from the vehicle, and Eaves had been seated next to the gas pumps, another police cruiser arrived with Candelaria, who had not been at the scene until that time.

47.    The video shows Candelaria had not previously approached the vehicle or interacted with its occupants.

48.    Warrantless searches of the vehicle and the three persons who had been in it resulted in narcotics being found on the person of Deasey but not on Eaves or Page.

49.    After Candelaria arrived and learned the results of the search, Eaves and Page saw Duffy approach Candelaria and they heard Duffy say, "This is what we're going to do," and he continued speaking in a whisper that was inaudible to Eaves and Page.

50.    Candelaria conspired with Duffy to report falsehoods as facts for the purpose of subjecting Eaves and Page to criminal liability for with trafficking and possession of narcotics, and with Duffy's cooperation and assistance that is what Candelaria did.

51.    Candelaria and Duffy used their authority as police officers to detain, falsely arrest and to maliciously prosecute Eaves and Page.

52.    The other officers at the scene, including officer Bishop, went along with Duffy's and Candelaria's false story.

53.    Their conduct demonstrated the existence of a code of silence among some members of the WPD.

54.    Candelaria's report was co-signed by a Sergeant supervisor: Sgt. "R-478."

55.    The officers did not have legal cause to search the vehicle or its occupants.

56.    Warrantless searches of automobiles without probable cause are routine occurrences in Worcester.

57.    At the time and place of Eaves' and Page's arrests, the officers in fact found no drugs on either of them or in the front of the vehicle where they had been riding.

58.    Because Eaves was on probation, his false arrest and malicious prosecution on new charges resulted in him being found to have violated terms of his probation, and he was jailed on $5,000 bail.

59.    Eaves' wrongful incarceration continued from the date of arrest until Candelaria's and Duffy's malicious prosecution of him collapsed in Worcester District Court on May 8, 2009, in light of a video recording that exposed the officers' deceptions.

60.   On information and belief, just before a hearing on that date on Eaves' motion to suppress evidence from the searches, Duffy and Candelaria viewed video recordings of the February 25, 2009, stop that had been taken by security cameras at the gas station.

61.   Duffy took the witness stand at the hearing and admitted that Eaves was not the driver of the vehicle, but Duffy perjured himself by testifying that he had found crack cocaine on Eaves.

62.   On information and belief, police administrators were present in the courtroom when Duffy testified.

63.   When Eaves' lawyer asked if he had seen the video, Duffy falsely testified he had not seen it.

64.   The examination continued: "Q: Okay, did you talk to your fellow officers about the video that they watched today?

65.   Duffy replied: "They mentioned something to me, yes."

66.   Duffy was asked if he had a chance to speak with officer Candelaria and the other officers who were scheduled to testify.

67.   Defense counsel asked Duffy, what if anything, he had discussed with Candelaria regarding the video, and in response Duffy testified:

> Ralph [Candelaria] was nervous 'cuz he said, "Ah, gee, my report. I put down that I stopped the car. And they got you on a movie saying you stopped the car. I'm like, "Yeah Ralph, that's what happens." It's like that's what happens. He [Candelaria] was worried about the inconsistency in the report. I'm like okay. So I tell him, Don't worry about it kid, because it's like, you just tell the truth and nothing's going to happen."

68.   Counsel next asked: "Q: All right. Did you talk about the details of the video?"

69.   Duffy replied, "Not, not really."

70.   When he gave this testimony Duffy had seen the video with Candelaria and they had discussed it.

71.   As counsel turned to questions regarding the stop, he asked Duffy: "Q: And you see Mr. Eaves in the passenger seat?"

72.   Duffy falsely replied: "Fiddling with the little cocaine wrapper."

73.     Counsel asked Duffy: "Did you see any drugs in the vehicle prior to asking him [Eaves] to exit?"

74.     In order to bootstrap a drug case against Eaves and Page Duffy falsely testified as follow: "Like I testified to, he's fiddling with a coke wrapper and the probable cause is the – the 911 call, plus the several, several days worth of items, Gee, there are people up here doing X, Y, and Z, that defendant with the pinpointed pupils. Believe me she was on opates (sic)."

75.     Here the false accounts of Duffy and Candelaria diverged.

76.     Duffy's false testimony was materially different from Candelaria's false report, because Candelaria claimed that he removed Eaves from the driver's seat after viewing "a bunch of glassine sandwich baggy knots all over the floor" while Duffy claimed Eaves was in the front passenger seat fiddling with a "cocaine wrapper."

77.     On the day of the hearing, due to the video prosecutors advised lawyers for Eaves and Page that they would drop the criminal charges against them arising from the stop.

78.     Eaves and Page signed a document entitled "Commonwealth's entry of nolle prosequi," which was co-signed by an assistant district attorney.

79.     The Worcester County District Attorney reported that the "police liaison for his office, the court and the Worcester Police Department were appraised of problems with the case." http://www.telegram.com/article/20110415/COLUMN44/104159739

80.     No criminal action was brought against Duffy for perjury or against Candelaria for intentionally filing a false report. *Id.*

**<u>Extorted No Sue Agreements</u>**

81.     When the charges against them were dropped, Prosecutors also warned Eaves and Page through their counsel that they must not complain to the WPD internal affairs department over their false arrest and prosecution or file a lawsuit in the matter.

82.     Eaves and Page were asked to sign a document stating they promised they would not sue the police ("no sue agreement"), and each refused to do so.

83.     Because the case against Eaves and Page had been exposed as a sham, they were able to refuse no sue agreements without fear that this would affect disposition of the charges against them.

84.     In other cases where defendants were more vulnerable, it was the policy and practice of the WPD, with the cooperation prosecutors, to seek no sue agreements from criminal defendants where officers' conduct had caused potential exposure to civil liability.

85.     Promises not to sue in exchange for dropping of criminal charges are illegal in Massachusetts.

86.     The plaintiff in *Brodin v. Rojas, et al.*, U.S. District Court for the District of Massachusetts docket No. 4:11-cv-40179-FDS, was asked to sign such an agreement.

87.     Brodin filed her suit against a number of Worcester Police officers and Gemme.

88.     A video recording of Ms. Brodin's booking at the WPD shows Officer Roman decking her with a punch to the face in the fingerprint room.

89.     Brodin alleged she had also been beaten off-camera at the station, shortly before Roman's videotaped punching, and had sustained fractures to the clavicle and cheek bone as well as other injuries.

90.     Brodin filed a complaint with the WPD Bureau of Professional Standards ("internal affairs") claiming she had been beaten and kicked in the head and was bleeding from various areas including her vagina.

91.      In 2008, when Brodin came to court and pleaded to certain criminal charges, a representative of the District Attorney's office provided a form for her to sign entitled "Withdrawal of Internal Affairs Complaint."

92.     The form stated the signer was formally withdrawing a complaint to internal affairs and stated further that: "I do this freely and voluntarily, under no pressure or duress, and for no consideration.  Further, I assert that no request was made for this withdrawal either on behalf of the Worcester Police Department or on behalf of the Worcester District Attorney; rather, I have decided to do this on my own volition."

93.     Brodin signed the form almost four months after her arrest and, in her case as in others it misrepresented the circumstances and reasons for withdrawing her complaint against WPD officers.

94.     Brodin signed the form withdrawing her complaint only because she believed, as she had been told, that she would be jailed for five years if she did not sign and that if she did sign she would be released on probation, and therefore the "agreement" was invalid.

95.     After Brodin signed the withdrawal form, she received probation.

96.     Brodin would not have received probation if she had refused to sign the form withdrawing her internal affairs complaint.

97.     Gemme was aware of Brodin's internal affairs complaint but chose not to investigate it while the criminal case was pending in order to wait and see whether Brodin would work out a plea agreement and agree to withdraw her complaint.

98.     After Brodin withdrew her complaint the officers she named were exonerated without a complete investigation, even though Roman's assault on Brodin was caught on tape.

99.     At all pertinent times Gemme was aware of and favored the use of the complaint withdrawal forms to induce criminal defendants to withdraw complaints against police in exchange for more lenient treatment by prosecutors.

100.    Withdrawal of internal affairs complaints should raise a high level of suspicion among police administrators and commanders because this may be the result of undue influence being brought to bear on a complainant who faces criminal charges.

101.    Acceptable police practices and procedures require careful scrutiny of complaints abruptly withdrawn at the time of disposition of a complainant's criminal case.

102.    The use of "Withdrawal of Internal Affairs Complaint" forms in the criminal courts is a tactic used by the WPD and Gemme to reduce the census of internal affairs complaints and investigations and to avoid lawsuits against the City and its police officers.

103.    At all pertinent times when a citizen withdrew an internal affairs complaint, not only were the officer or officers involved exonerated, but Gemme realized a benefit to himself and the WPD by virtue of statistics showing fewer complaints and by virtue of investigations not performed.

104.    Between 2007 and 2009, the period in which use of the "Withdrawal of Internal Affairs Complaint" began, citizen complaints of misconduct by WPD officers dropped by 50%, according to the Worcester Municipal Research Bureau.

105.    There are many other examples of these agreements, all of which Gemme was aware of and condoned.

**Gemme Turned a Blind Eye to Eaves' Allegations of Misconduct**

106.    On April 15, 2011 the Worcester Telegram & Gazette published a piece by columnist Clive McFarland entitled "Honesty is the best policy," disclosing Candelaria's false reporting as revealed by the video recording of Eaves' arrest. http://www.telegram.com/article/20110415/COLUMN44/104159739

107.    As a result, Gemme had no choice but to go through the motions of ordering an investigation into the arrest.

108.    Gemme received copies of the video recording and of the  transcript of the May 8, 2009, hearing in Eaves' and Page's criminal case early in May of 2011, but on information and belief the WPD has taken no action to date regarding the false reporting, deception, perjury and malicious prosecution by Candelaria and/or Duffy.

109.   The WPD's internal affair policy required that most investigations be concluded within 90 days.

110.   Gemme has not sought to discipline Candelaria or Duffy in connection with the incident.

111.   A genuine investigation into Eaves' arrest and prosecution would expose a code of silence within the WPD regarding reporting, or not reporting, officer misconduct, but in the WPD accountability for police officers has been virtually devoid of substance in the handling of citizens' complaints of serious misconduct such as use of excessive or unjustified force, framing on criminal charges, or extortion of a false confession.

112.   Gemme was aware that Duffy had gotten special treatment before the Eaves arrest.

113.   On April 5, 2008 WPD, police were dispatched to Early's Garage in Worcester on a report of domestic trouble involving Duffy and his daughter.

114.   Sgt. Francis Lahey instead of arresting Duffy, as he was required to do by law on a domestic case, spun the facts in Duffy's favor in order to avoid arresting him.

115.   Sgt. Lahey justified not bringing a criminal charges against Duffy by putting unthruthful information in his report: "It is the opinion of the Undersigned Sergeant that no crime was committed by PO Duffy. Under the circumstances, no crime was committed by young 'J.' Her behavior was that of a 14 year old rebellious adolescent who was bold, defiant, and willfull (sic) who was upset and very angry for not getting her way. Although this incident was coded as Domestic Trouble [this] incident (sic) it is the opinion of the Undersigned Sergeant that it was not so because PO Duffy has no parental rights over "J", a circumstance confirmed by the grand-father. Indeed, at no time "J" refer to Duffy as her father nor did she in any way give an indication that he is her father. Actually, she only referred to him as "him" or "he."

116.   Duffy got a free pass because of his position as a police officer, i.e., in the same circumstances, a civilian would have been arrested.

117.   Sgt. Lahey's report demonstrates a code of silence that protects some WPD police officers from the criminal process that applies to other citizens.

118.   Eventually a special prosecutor did press criminal charges against Duffy for allegedly striking his daughter in the incident, and he was acquitted after a bench trial by a District Court Judge.
http://www.telegram.com/article/20120110/NEWS/101109868/0/newsrewind

119.   Though Sgt. Lahey's report used a purported lack of parental rights to shield Duffy from criminal process, Lahey was not called to account.

120.    Duffy was involved in two other incidents that led to federal civil rights actions claiming brutality and other misconduct by police by police - incidents that resulted in no discipline, as described below.

**The WPD's Pattern and Practice of False Reporting Without Discipline**

121.    The false reporting and manipulation of evidence by officers that resulted in the Eaves' wrongful arrest and incarceration was not an anomaly within the WPD; rather it was an example of policy and practice within the City and the WPD of allowing officers to deliberately withhold facts and lie in official reports in order to conceal their own wrongdoing and/or to fabricate cause for warrantless searches, false arrests and malicious prosecutions -- all without the WPD correcting, reprimanding or disciplining officers for such conduct.

122.    At the time of Eaves' arrest ("the incident") and continuing to date, the City, O'Brien, and Gemme maintained a policy, practice, and usage of not investigating allegations of abuse by WPD officers, even when the alleged victims filed civil rights suits in state or federal courts, unless such persons also complained to WPD internal affairs.

123.    At the time of the incident and continuing to date, the City, O'Brien, and Gemme maintained a policy, practice and usage of not initiating investigations or taking other corrective measures in the face of glaring factual discrepancies between the official reports of arresting officers and such objective evidence as physical injuries to arrestees or – as in the case of Eaves – a video recording of an incident.

124.    At the time of the incident and continuing to date, Gemme established and maintained a policy, practice, of doing such misconduct investigations as were done in a manner calculated to discredit the accusations and exonerate officers, without serious effort to learn the truth.

125.    Citizens who complained of police misconduct were called to taped internal affairs interrogations, amounting to adversarial cross-examinations, while Gemme allowed officers to merely fill out questionnaires, known as Inter-Departmental Correspondence ("IDC") without submitting to interrogation.

126.    Other Massachusetts police departments, some smaller than the WPD, *require* that every officer who is investigated for misconduct submit to a face-to-face taped interview (e.g., The City of Lawrence, The City of New Bedford and others).

127.    The WPD's use of IDC reports in lieu of mandatory interviews allows officers to avoid giving substantive statements by generally stating that they don't remember an event or have no knowledge of the incident.

128.    Often times officers that are being investigated will exchange reports with other officers in order harmonize possible discrepancies.

129.    Rarely, if ever, are officers who prepare IDC reports interviewed by internal affairs.

130.    At the time of the incident and continuing to date Gemme knew that WPD internal affairs investigations failed to comply with acceptable standards of police practice.

131.    At the time of the incident and continuing to date, this *ersatz* investigatory system, sanctioned by Gemme and the City, protected and fostered a  code of silence within the ranks of the WPD regarding untruthfulness and other types of misconduct, and failed to correct, discipline, prevent, or control misconduct by Worcester police officers.

132.    At the time of the incident and continuing to date, Gemme knew of the effectiveness of face-to-face interviews in internal police investigations and he used this approach when dealing with certain police officers that he considered to be his enemies.

133.    At the time of the incident and continuing to date Gemme's policy, practice and usage was to apply variable standards of discipline depending on the individual officers involved and their units – some favored, some less so, and some little or not at all.

134.    This demonstrated a callous disregard and deliberate indifference to the rights of citizens in coming into contact with the WPD; it did not comply with acceptable professional police practices, and because it fostered the belief in some officers that their misconduct would not be punished, it was the moving force behind Candelaria's and Duffy's false arrest and malicious prosecution of Eaves.

135.    By maintaining, condoning and allowing these policies and practices O'Brien and Gemme communicated to the ranks of the WPD that dishonesty, particularly in the filing of false reports, would be tolerated and would not result in a serious inquiry or discipline.

136.    Before the arrest of Eaves, O'Brien and Gemme knew of numerous instances where officers' reporting on their uses of force bore little or no resemblance to the claims of their victims or to the levels of force revealed by wounds.

**The Rawlston Case**

137.    On April 7, 2007 two male teenagers complained that they were pistol whipped and kicked by an Officer Rawlston of the WPD in a confrontation outside Rawlston's home.

138.    Rawlston reported that he had "inadvertently" struck only one of the boys in the head with the barrel of his firearm.

139.    Gemme moved to terminate Rawlston on grounds of lying and untruthfulness in connection with the force he used, on grounds of assault and battery with a handgun and with a shod foot, and on grounds of conduct unbecoming an officer and careless use of a weapon.

140.    At an arbitration hearing in this termination dispute, Gemme testified he was aware of the corrosive effect that untruthfulness by a police officer has on that officer's effectiveness.

141.    Gemme ordered a criminal investigation into Rawlston's conduct, and directed the detective bureau, to investigate but not to reach conclusions.

142.    Sgt. Mark Richardson ("Sgt. Richardson"), who became the lead investigator, disobeyed Gemme's order as to no conclusions and gave opinions favorable to Rawlston.

143.    At the arbitration hearing Gemme and the City took the position that Sgt. Richardson had tried in his investigation to bolster Rawlston's story while tearing down statements of other witnesses thereby demonstrating "his bias . . ."

144.    Gemme asserted that Sgt. Richardson had lied during the interrogation and questioning of one of the complaining witnesses about a statement that had been allegedly made by another complaining witness.

145.    But in the overwhelming majority of instances involving accusations of misconduct by police officers, Gemme and WPD internal affairs give great credence to officers' statements, little or none to complainants', and they ignore glaring discrepancies between police accounts and forensic evidence.

### Nga Truong: A Case Study of Misconduct Without Discipline

146.    On December 1, 2008, 16-year old Nga Truong was interrogated by two WPD detectives (one of them Sgt. Pageau) following a 911 call that her one-year-old baby was unconscious and unresponsive, after which the child was declared dead.

147.    During a two-hour interrogation of the distraught minor Nga, Detective Sgt. Pageau lied to her when he reported to her the medical examiner had told him her baby was smothered to death.

148.    Sgt. Pageau, who knew when he questioned Nga that a medical examiner had found the cause of death to be undetermined, lied to Nga when he said the medical examiner "told me that that baby was smothered."

149.    Sgt. Pageau continued to misrepresent the facts to the mother: "We have scientific evidence – one day after his death and believe me we're still doing tests – I can tell you that boy was smothered. . .  To death."  See e.g. Boeri D, Anatomy of a Bad Confession, Part 1; WBUR, December 7, 2011. http://www.wbur.org/2011/12/07/worcester-coerced-confession-i

150.    Sgt. Pageau promised Nga that if she confessed to killing her child she would be treated as a juvenile offender.

151.    Nga falsely confessed and was expecting to be released so she could arrange her child's funeral, but instead she was locked up and charged with murder as an adult in Superior Court.  *Commonwealth v. Nga Truong, No. CR20090385.*

152.    Nga remained incarcerated for about two years until the Honorable Janet Kenton-Walker, Associate Justice of the Superior Court ("The hearing judge") ruled on February 25, 2011, granting  Truong's motion to suppress the confession.

153.    In her Findings the hearing judge questioned and rejected many elements of Sgt. Pageau's testimony as being "simply not credible."

154.    After concluding that Ms. Truong's confession was involuntary the hearing judge opined: "In addition, the police repeatedly confronted Nga with knowingly false statements that they had conclusive medical and scientific evidence proving she had killed Khyle, which included false information regarding the presence of lividity and scientific evidence that Khyle had been smothered. Compounding this was the police insisting that Nga had killed Hein eight years earlier, despite having police reports, DSS records, and an autopsy showing that Hein's death had been investigated and determined to be a SIDS death." *2011 WL 1886500* (Mass. Super.)

155.    The Hearing Judge noted that the suggestions of leniency in exchange for a confession coupled with false statements of "irrefutable evidence" undermined the voluntariness of the confession.

156.    Finally the Hearing Judge described Sgt. Pageau's conduct as "a combination of trickery and implied promises . . ."

157.    The findings of the judge in the Nga case did not deter Gemme from expressing full support of his detectives' conduct. *See*, e.g. Boeri D, Questions Remain in Coerced Worcester Confession.  WBUR, Febr. 16, 2012. http://www.wbur.org/2012/02/16/worcester-police

158.    Gemme took no disciplinary action against Sgt. Pageau or the other officer involved, Detective Doherty.

159.    Sgt. Pageau, the lead detective in the Nga investigation, was later assigned to investigate citizen complaints against WPD officers for internal affairs.

160.    When WBUR reporter David Boeri interviewed Gemme the chief would only suggest that the district attorney's office had wrongly decided not to appeal the ruling tossing out Nga's conviction.

161.    The reporter stated to Gemme: "And he [D.A. Early] didn't' appeal the case in which the judge said that your two detectives had engaged in a pattern of deceit, trickery, false promises, implied promises and inducements . . ."

162.    Gemme would only reply: "And I suggest that you speak with the district attorney."

163.    Gemme's conduct and actions after the conduct of his detectives toward Nga had been exposed demonstrated a reckless and callous disregard to rights of citizens coming into contact with officers of the WPD.

164.    Gemme's reaction to the ruling in the Nga case was not an isolated event; rather it reflected the established policy, practice, and usage of the WPD of failing to safeguard the constitutional rights of persons coming into contact with officers.

165.    Every time a Court has declined to credit the sworn testimony of a WPD officer, Gemme has stood by the officers involved, meeting evident dishonesty with no serious inquiry or discipline.

**Gemme's Endorsement of False Testimony**

166.    Since August 2003, the City and Gemme have been made aware that on more than one occasion evidence in a criminal case was suppressed because a judge did not believe the testimony of vice squad officers.

167.    On August 29, 2003, then Superior Court Judge Ralph Gants wrote: "After careful consideration, this Court has come to the conclusion that Sgt. O'Connor intended to lie to the Court by falsely fabricating consent to enter the apartment to avoid the legal difficulties of justifying the entry without such consent."

168.    Judge Gants wrote "in view of this finding, this Court directs the District Attorney to provide a copy of this decision to the Chief of the Worcester Police Department so that consideration can be given to whether disciplinary action against Sgt. O'Connor is appropriate." Id. at fn. 2 p. 6.

169.    When the Massachusetts Appeals Court backed Judge Gants' ruling asserting that Lt. O'Connor had intended to lie, Chief Gemme, who served as a Captain in the Vice Squad when the motion to suppress was decided, stated that O'Connor had his full support. Source, Telegram & Gazette Article Gary V. Murray, August 1, 2008. http://www.telegram.com/article/20080801/NEWS/808010544/1006/NEWS07

170.    The same vice squad officers were found in another case to have violated constitutional protections, when then Superior Court Judge Judge Peter Agnes writing: "[E]very person in this Commonwealth has an interest in insuring that the police observe the limits imposed by our state and federal constitutions and laws. In this case, those limits were not observed."

171.    Judge Agnes refused to credit testimony of Lt. O'Connor that a criminal defendant had been read Miranda rights in that case.

172. Judge Agnes refused to credit testimony of Lt. O'Connor that a criminal defendant had admitted he was in possession of a large quantity of drugs in his home in that case.

**Junior Nicasio**

173. On June 27, 2009, when police responded to a reported domestic incident at an apartment in the Great Brook Valley area, they found Junior Nicasio sleeping on a sofa and, notwithstanding that they had already arrested the alleged assailant, they beat Nicasio in the head and left him at the scene suffering from nondisplaced bilateral fractures of the zygomatic arches, of the bilateral orbital walls, and a minimally depressed left frontal sinus fracture.

174. Nicasio bled profusely and was plainly injured, but officers made no attempt to get him medical care and made no report of the force used on him or of the injuries.

175. In order to in order to hide the link between their conduct and injury of an innocent person, officers did not offer to get Nicasio medical care.

176. Nicasio's name does not appear in the police report, and the police report does not reflect anyone being injured.

177. Nicasio complained to the WPD internal affairs department.

178. Though Gemme was aware of Nicasio's complaint after March 12, 2010, he failed to complete an investigation into allegations of misconduct and imposed no discipline on the officers involved.

**George Rosenthal**

179. On March 8, 2008 George Rosenthal ("Rosenthal") was arrested by a group of WPD after being accused of entering a building and removing ferrous metals and copper from the building.

180. Rosenthal was ordered to come down a flight of stairs and he complied and approached the officers peaceably with nothing in his hands.

181. As Rosenthal reached the officers one of them said, "I hate thieves," struck him in the face with a closed fist, spat at his face, grabbed him and struck a wall with Rosenthal's head.  *See*, Second Amended Complaint, filed 2/17/2012, *Rosenthal v.  City of Worcester et al.* U.S. District Court, District of Massachusetts, Docket No. 4:11-cv-40113-FDS (Document 19).

182. Rosenthal collapsed and the officers repeatedly punched and kicked him as he lay on the floor trying to get back to his feet and trying to shield his head and body from blows. Second Amended Complaint at ¶ 19.

183. Spinelli, the arresting officer lied in his report by writing that Rosenthal walked towards him with a pipe in a menacing and refused to drop the pipe. *Id.* at ¶ 26-31.

184. Spinelli lied when he reported that he punched Rosenthal in the face in self defense and maliciously prosecuted Rosenthal for resisting arrest.

185. WPD policy prohibited blows to the head, except in cases of imminent danger to life or limb, but some officers would strike subjects in the head in situations where this was not justified, causing such injuries as concussion, and fractures of the skull and facial bones.

186. Rosenthal sustained multiple fractures to the maxillary sinus wall and comminuted fracture to the left orbital and lateral walls.

187. As Rosenthal's beating ended an officer stated to him: "You fell down the stairs, you hear me?  If you don't say you fell down the stairs it will be a lot worse than this." Id. at ¶ 22.

188. Each of the officers present for the beating and/or the threat countenanced the filing of a false report.

189. On March 2, 2010 Rosenthal gave notice to Gemme and the City of his complaints, included photographs of his injuries, and he provided medical records documenting his injuries.

190. Sgt. Pageau was assigned to investigate the case for internal affairs and interrogated Rosenthal on March 10, 2011.

191. Sgt. Pageau's interview was an adversarial examination designed to discredit Rosenthal.

192. Internal affairs conducted no such in-person interrogations of the officers involved, and on information and belief the investigation has resulted in no discipline to date.

193. The internal affairs investigation remains open.

**Carlos Valencia**

194. On November 21, 1996 members of the Worcester Vice Squad beat Carlos Valencia, delivering blows to the head with a flashlight during the execution of a warrant, causing serious injuries to the head.

195. Valencia had to be hospitalized and required staples in his head.

196. Valencia was not arrested and was left injured at the scene to fend for himself.  *Valencia v. McGee, The City of Worcester,* US District Court (D.Mass. CA No. 99-40018 NMG).

197.   When Valencia was beaten Gemme headed the police unit whose members assaulted Valencia, and Gemme knew then that beatings of innocent persons at scenes of searches and/or arrests were acceptable customs and practices within the WPD.

198.   The WPD disciplined no one for Valencia's beating, thought the City paid to settle his civil rights claims.

**Heriberto Muniz**

199.   At the time of Eaves' arrest Gemme and O'Brien knew of the claim by Heriberto Muniz that he was subjected to the unjustified and unreported use of force by members of the WPD gang unit.  *Muniz v. City of Worcester et al.,* U.S. District Court, District of Massachusetts, Docket No. 4:09-cv-11950-FDS.

200.   Muniz alleged in his federal complaint that on October 8, 2008 during the execution of a warrant he was pistol whipped, splitting the skin behind the left ear and lacerating the ear lobe, that he was beaten and punched and as a result sustained a fractured fibula.  Muniz' Statement of Fact  in Support of his opposition to Defendants Motion for Summary Judgment, dated 1/28/11, at ¶ 2-3, Document No. 43.

201.   A picture of Muniz published in the Worcester Telegram & Gazette shows multiple injuries on the right side of his face that were not mentioned in the police report. *See*, e.g., Police Brutality Alleged, Thomas Caywood, March 8, 2009 Worcester Telegram & Gazette. http://www.telegram.com/article/20090308/NEWS/903080415/0/FRONTPAGE

202.   Muniz' counsel alleged that "Several other officers participated in the beating, and that two officers . . . did nothing to intervene." *Id.* at 85-100 (Document 43, 1/28/11 – Plaintiff's Local Rule 56.1, Statement in Support of his Opposition to Defendant's Motion for Summary Judgment.

203.   Documents filed with the Court identify the other officers involved as: Gary Morris, Chris Panarello, Tom Duffy, Sergeant Stephen Roche, Neftali Batista and Nate Reando.

204.   Although no contraband was found on Muniz and he was never placed under arrest, he had to be transported by ambulance to a hospital.

205.   Court records show the police report minimized the injuries to Muniz and attributed them to causes other than physical abuse, stating that "Mr. Muniz hit the side of his head on a car engine as he and the officers tripped over tools and tumbled to the floor in the struggle, according to the chief [Gemme]." http://www.telegram.com/article/20090308/NEWS/903080415/0/FRONTPAGE

206.   Gemme knew that the police reports in connection with the Muniz arrest contained false information.

207.   Shortly after Muniz complained to internal affairs, Gemme spoke with reporters and stated that, while he was still waiting for more information on the matter, the gang unit "will continue to have my support unless there's something that's brought to light that changes that.  Right now, they have my every confidence."

208.   The WPD conducted no investigation, as Gemme knew it would not, because of Gemme's bias in favor of his gang unit officers.

209.   Two of the officers Muniz complained against admitted under oath that they were not interviewed or questioned by anyone from the internal affairs department in connection with the incident.  *Muniz,* Document 43 at ¶ 11, 12, 1/28/11.

210.   One of them also admitted in a deposition that he had been subject of eight other internal affairs investigations and testified that he did not remember any details about those investigations, except that he recalled he had never been interviewed face-to-face but rather had been required only to write a report. *See e.g.,* Document 43, 1/28/11 at ¶ 11.

211.   After this Court  ordered the City to produce internal affairs records of the gang unit members in March of 2011, the City agreed to settle the Muniz lawsuit, and so the order to produce became moot.

212.   Gemme cleared the officers involved in the Muniz incident, and by failing to investigate or discipline those responsible, the City and Gemme communicated to the ranks within the WPD that acts of brutality such as those Muniz experienced would not result in discipline.

**Charles Evangelista**

213.   In the case of Charles Evangelista the foregoing policy encompassed tolerating the mysterious disappearance of a video that would have proven or disproven that an arrestee was beaten in custody.

214.   Evangelista alleged in a federal suit that, while he was in custody of the WPD on March 16, 2003, he was beaten, kicked and stomped, causing his bladder to rupture. *Evangelista v. Marcotte et al.,* U.S. District Court, District of Massachusetts, Docket No. 05-CV-10311-ML.

215.   Evangelista also alleged in his federal complaint that the City destroyed a surveillance tape that would have depicted the beating.

216.   Gemme claimed the tape, had been mistakenly "rewound" and erased.

217.   The City paid $250,000 to settle Evangelista's claims

218.   Gemme and the City claimed Evangelista's claim was investigated but that no wrongdoing was found.

219.   Any investigation done was woefully deficient and evinced deliberate indifference to the rights of citizens coming into contact with the WPD.

220.   Gemme exonerated the officers involved in the Evangelista incident, stating to the press, "I have absolute faith in the officers and supervisors who were on scene that day."

221.   Gemme explained the settlement as a business decision, stating to the press: "When you buy into risk assessment you have to say you are willing to absorb some costs."

222.   Defendant O'Brien agreed with Gemme regarding the settlement of the Evangelista claim and was aware of the Evangelista's allegations.

223.   After settling with Evangelista, City and its policymakers made no changes to the policies and procedures to ensure preservation of police station videos.

**Daniel Houde**

224.   Daniel Houde alleged that on May 20, 2002, due to a WPD beating he sustained nine bilateral facial fractures.  *Houde v. Turgeon, et al.*, US. District Court, District of Massachusetts, 05-40075-FDS. See e.g., Complaint at ¶ 57.

225.   Duffy was a codefendant in the Houde suit, along with Robert Turgeon, Kevin Johanson, Gunnerson, Brian Halloran and Matthew D'Andrea.

226.   The police reports of this incident reveal how the WPD encouraged officers to hide the level of force officers used with the use of vague terms such as "violently resisting," without  explanation of the circumstances or the conduct of the police or the arrestee.

227.   In Houde's case police explained his multiple facial fractures and other injuries by reporting that "during the altercation Houde suffered a laceration above his right eye."

228.   This Court denied the officers' motion for dismissal on qualified immunity grounds.

229.   The Court found that: "Viewing the evidence in the light most favorable to Houde, there is a genuine issue as to whether it was reasonable for six police officers to beat an unarmed suspect who was passing in and out of consciousness. Furthermore, the graphic color photographs taken of Houde after his arrest, the reaction of the booking officer and judge to his appearance, and his hospital records indicate that he was seriously injured . . .What began as a traffic stop for a minor violation rapidly escalated into a physical altercation, in which Houde was severely beaten and sustained substantial physical injuries.  Viewed from the standpoint of an objectively reasonable officer, Houde's resistance to defendants' efforts to handcuff him may not have warranted such an extreme response.  A reasonable officer may not have believed that defendants' conduct was appropriate."

Memorandum and Order, September 30, 2007, Hon. F. Dennis Saylor IV

230.  The City, after denying its police wronged Houde, paid $100,000 to settle his claims.

231.  Gemme saw no need for a WPD investigation, as he explained to a newspaper reporter, because Houde "did not file a complaint with the police department."

232.  In Gemme's tenure as Chief of Police, despite numerous settlements and judgments in suits against the City for police misconduct, no incident resulting in a suit has led to discipline against a WPD officer.

233.  Houde's case exemplifies how the Code of Silence operated from the lowest to the highest levels of the WPD.

**Richard N. Tousignant, Brandon S. Blair, Randy Boucher and Leon A. King**

234.  Richard N. Tousignant and Brandon S. Blair proved in June of 2010, according to a jury verdict, that WPD officers had falsely arrested them and had used excessive force during an incident in December, 2001.

235.  The City did not investigate this case.

236.  On June 29, 2010 a jury of this Court found the defendants liable for $150,000 in compensatory and punitive damages. *Blair and Tousignant v. Towler et al.*, U.S. District Court District of Massachusetts, CA No. 06-40129 FDS.

237.  Duffy was a codefendant in *Blair* along with Peter Towler, Jimmy Moore and officer Ortiz. [1]

238.  Gemme was Chief of Police when the verdict was announced.

239.  Gemme did nothing to investigate or discipline any officer involved**.**

240.  The City paid the compensatory and punitive the jury imposed, plus legal fees and costs of appeal.

241.  The same incident led to a separate suit by Randy Boucher and Leon A. King, II, against the same officers Tousignant and Blair sued. *Boucher and King v. City of Worcester et al.*, US. District Court District of Massachusetts CA No. 04-12673 REK.

242.  Duffy was a co-defendant in *Boucher and King***.**

243.  King (then the Commissioner of Corrections for the City of Philadelphia), alleged that when he asked for the names of the arresting officers as he lay face down on the ground they responded by kicking him.

---

[1] Just before trial Duffy was voluntarily dismissed from the case.

244.   Gemme was the Chief of Police and O'Brien the City Manager when the City settled with Boucher and King April 24, 2006.

245.   The *Boucher and King* defendants were not discipline, nor was there any change to the WPD's policies and procedures as a result of either *Boucher and King* or *Blair and Tousignant*.

**Joseph P. Consolo**

246.   Gemme and O'Brien knew that in 1996 the United States First Circuit Court of Appeals affirmed a $90,000.00 verdict against two Worcester police officers for being deliberately indifferent to medical needs of a prisoner, Joseph P. Consolo.

247.   The officers involved were not disciplined.

248.   Edward P. Gardella, Worcester Chief of Police at that time, testified on behalf of the two officers as a character witness and personally vouched for them before a federal jury. *Consolo v. George*, et al., United States Court of Appeals, First Circuit, No. 94-1202.

249.   The City also had the head of the WPD training division (Capt. Roger Steele) testify as an expert that the use of force involved and the post-arrest conduct complied with departmental rules and regulations.

250.   Despite the verdict and the money that the City was ordered to pay, the City's policy-makers made no changes to the WPD policies and procedures as a result *Consolo*.

251.   Instead the City and its policymakers ignored the findings of a federal appeals court upholding a jury's finding that WPD officers violated the civil rights of a citizen.

**Marc Muldoon**

240.   On April 2, 2009 the City agreed to settle another federal civil rights claim in which a prisoner alleged that an officer Watkins had struck him in the back of the head with a metal baton fracturing his skull.  *Muldoon v. Waktkins & City of Worcester*, US. District Court, CA No. 06-40237 FDS.

241.   Worcester paid $33,000.00 to settle Muldoon's claims.

242.   In Muldoon, as in Evangelista, O'Brien, Gemme and the City abdicated their responsibilities by failing to investigate, train or discipline the officer involved and by justifying the settlement without discipline as a cost of doing business.

243.   Gemme told a newspaper reporter on April 2, 2009, that decisions on settlement of suits against officers "are left to the Law Department and the City Manager.  Ultimately it comes down to risk and a business decision, and that's what happened in this case."

244.    To justify beating a man in the head, which could have resulted in grave injury or death, Gemme told reporters: "You have to look at what these police officers are faced with, people who are intoxicated and very violent, and the police officer is trying to protect himself and any citizen who is nearby."

245.    In making this statement without investigation of the incident or of the officer's reporting of it, Gemme signaled to the force that false reporting would not result in discipline.

**Dennison**

246.    On May 23, 2009, after the City agreed to settle the claims of Raymond Dennison in *Dennison v. LaPointe, et al*., U.S. District Court, District of Massachusetts, CA No. 06-40100FDS, Gemme stated to a reporter: "As we've said in the past, it's a business decisions between myself, the law department and the city administration."

247.    Though the officers' report of Dennison's arrest did not explain bruising of Dennison's back showing the unmistakable imprints of a steel police baton, Gemme stated investigation had "cleared" the officer.

248.    By his public comments and official action in this case Gemme as the maker of WPD policy communicated to force that acts of brutality, with false reporting to avoid responsibility for them, would be tolerated and condoned.

**Huyhn**

249.    On or about March 2010 the City of Worcester agreed to pay Trung Huyhn the sum of $47,500.00 in connection with his allegations that various officers had beaten him and inflicted a broken arm, among other injuries.

250.    Gemme cleared the officers involved, and by doing so and by failing to fully investigate, or discipline those involved in the case, Gemme as policy maker communicated to the force that acts of brutality and false reporting would be tolerated and condoned.

251.    O'Brien was aware of and approved the settlement and was aware of the underlying allegations by Trung.

**Anthony Hayes**

252.    Both Gemme and O'Brien were aware of the lawsuit captioned, *Hayes v. McGee, et al*., US. District Court, Docket  No. 10-40095-FDS, alleging that during a drug raid of March 2, 2007, he sustained an orbital fracture due to being struck in the face with a hard object.  Complaint at ¶ 201.

253.   When he was booked in the police department and had visible signs of injuries he was asked what happened to him and Hayes replied "I just got hit in the face with a flashlight." Amended Complaint ¶ 191.

254.   Though Hayes was clearly injured when he presented for booking at the policed station, the arresting officer's report portrayed the arrest as uneventful and gave no hint at all as to how Hayes got hurt, but no one at the WPD called for the officer to explain.

255.   Hayes was taken from the WPD station to the hospital where he told doctors: "The police kicked my door in and beat my face." Id. ¶ 222.

256.   A few days later, the arresting officer (a police Sergeant today) was ordered to prepare an injured prisoner report required by Massachusetts law under G.L. c. 276 Section 33, amended complaint at ¶ 124.

257.   When Sgt. Davenport was asked to account and explain how Hayes got hurt, he filed a false injured prisoner report that said: "Mr. Hayes was standing between the table and a bed. At that time Vice Detectives took Mr. Hayes to the floor in an effort to secure him. While being placed on the floor Mr. Hayes may have struck his head on the frame of the bed. Mr. Hayes was then secured without further incident." Amended complaint at ¶ 125.

258.   Hayes was diagnosed with multiple facial fractures, including displaced fractures of the anterior wall of the right maxillary sinus and a probable fracture at the posterior wall of the right maxillary sinus.

259.   Plastic surgery was required to reassemble fractured and fragmented bones in Hayes' face and to restore crushed sinuses. Amended Complaint at ¶ 229-230.

260.   Although Hayes complained to the WPD and provided medical records verifying injuries that were grossly inconsistent with the official account of the arrest, Chief Gemme wrote Hayes that "your complaint is not sustained, i.e. there is not sufficient evidence to either prove or disprove the allegation."

261.   Despite an abundance of evidence that Detective Darnell McGee ("McGhee") assaulted Hayes, Gemme, O'Brien and the City chose to ignore it.

262.   Unlike the Rawlston case, Gemme never ordered detectives to investigate Hayes' complaint for criminal conduct.

263.   When Gemme, despite Hayes' account of his arrest and incontrovertible evidence of blunt force trauma to his face, cleared all officers involved, he confirmed the continued existence of a WPD policy and practice of tolerating false reporting to cover up misconduct.

264.   In December 2012 a retired WPD officer "retired officer" came come forward with critical information in the Hayes case.

265.    The retired officer prepared an affidavit in which he recounted a conversation he had with McGee around May of 2009.

266.    The retired officer encountered McGee while visiting Suney's Pub, on Chandler Street in Worcester, where McGee was working a private security detail.

267.    The retired officer stated in his affidavit that he asked McGee if he knew Hayes, and that McGee replied that he knew him and stated that "I fucked him up."

268.    The affidavit further states that when the retired officer said to McGee he knew Hayes, McGee replied, **"**Oh shit, I fucked him up."

269.    After Hayes' counsel provided the retired officer's affidavit to counsel for the City and for other defendants in Hayes' action, McGee contacted the retired officer by telephone on or about January 26, 2012.

270.    McGee asked the retired officer, "Hey, did you speak with Hector Pineiro [Hayes' counsel]?"

271.    McGee also asked the Retired officer: "How did you get hooked up with Hector?"

272.    When the retired officer explained the circumstances of how he came to prepare his affidavit, McGee stated to him: "This is going to fuck me."

273.    The retired officer told McGee "I got to do what I got do."

274.    McGee asked the retired officer if he was "going to go to court," and the retired officer responded that he would.

275.    The retired officer told McGee he should not have called him.

276.    McGee's conduct, as a party in a civil suit contacting a witness in that matter regarding the witness' testimony, reveals not only witness tampering but the code of silence that McGee invoked and sought to enforce by calling the retired officer.

277.    If called to testify the retired officer will explain how the code of silence worked in the WPD during his employment there.

278.    The cases enumerated above are some, but by no means all, of the cases that demonstrate the policy, practice and usage of the WPD in allowing its officers to violate the rights of citizens, and to lie in official reports to cover up misconduct and/or to further malicious prosecution, all without fear of discipline or criminal process.

\

## COUNT I
### 42 U.S.C. § 1983
### Candelaria, Duffy

279.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

280.   As a direct and proximate result of Candelaria's and Duffy's violations of his constitutional rights to due process and to be free of unreasonable search and seizure, Eaves was wrongfully arrested, prosecuted and incarcerated, as set forth herein.

## COUNT II
### 42 U.S.C. § 1983, Supervisory and Monell Liability
### City of Worcester, O'Brien, Gemme

281.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

282.   The defendants City of Worcester, O'Brien and Gemme, by their custom and usage of failing to exercise discipline and control over false arrests and/or false reporting and other misconduct by WPD officers, acted and/or failed to act with deliberate indifference to the constitutional rights of individuals who came in contact with the WPD, which in whole or in part was the moving force behind the unlawful misconduct of Candelaria and Duffy.

283.   The conduct of defendants City of Worcester, O'Brien and Gemme proximately caused of plaintiff's civil and common law rights complained of herein.

## COUNT III
### False Arrest
### Candelaria and Duffy

284.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

285.   By their conduct as set forth herein, Candelaria and Duffy did cause Eaves to be arrested and detained without probable cause, and as a direct and proximate result he was wrongfully detained for 73 days.

## COUNT IV
### Malicious Prosecution
### Candelaria and Duffy

286.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.
287.   Candelaria and Duffy, by all their actions as set forth herein and by aiding, abetting, and/or proffering perjured testimony for the prosecution of Eaves, did maliciously prosecute him and subject him to wrongful incarceration.

<u>PRAYER FOR RELIEF</u>

The Plaintiff respectfully requests the Court to order the following relief:

1.      All compensatory damages recoverable;
2.      All punitive damages recoverable;
3.      All attorney's fees, costs and expenses allowable;
4.      That defendants be found jointly and severally liable;
5.      Any and all other relief as the Court deems just and proper;

<u>PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL COUNTS IN THE COMPLAINT</u>

Respectfully submitted,
Ricky N. Eaves, Plaintiff
By his attorneys,

*/s/ Hector E. Pineiro*_____
Hector E. Pineiro, BBO # 555315
Robert A. Scott BBO # 648740
Emilio Torres-Requena BBO #549427
Law Office of Hector E. Pineiro, LLC
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600
hector@pineirolegal.com
robin@pineirolegal.com

DATED:  2/24/2012